We'll hear argument next in Case 18-1501, Liu v. the Securities and Exchange Commission. Mr. Rappui. Mr. Chief Justice, and may it please the Court, SEC disgorgement orders compel a payment to the Treasury as a consequence for violation of a public law. An order like that as a penalty is this Court's unanimous decision in Kokesh makes clear. A penalty must be authorized by statute. So must any action by an administrative agency. There is no statutory authority for the SEC to seek disgorgement orders from a federal court, and therefore it cannot. I have three main points to make this morning. First, the text, structure, and context of the securities laws offer a straightforward route to reversal. Congress has created for SEC court actions a tiered system of civil money penalties that does not include disgorgement. Congress has also given the SEC authority for an order requiring accounting in disgorgement using those very words in an administrative proceeding, but no similar authority for court actions. And Congress has given other agencies clear textual authority for judicial disgorgement orders. Using traditional tools of statutory construction, the result is clear. The SEC can seek the authorized penalties, but no others. Second, the statute's allowance for equitable relief does not help the SEC because penalties are not equitable relief. That has been the law for centuries. There is no principal distinction between the characteristics that make SEC disgorgement a penalty under Kokesh and those that make it a penalty under the old equity rule. Its purpose is to punish disobedience of a public law. Any return of money or property to those injured by the violation is discretionary at best and often never happens. Third, the phrase equitable relief enacted as part of Sarbanes-Oxley in 2002 did not ratify circuit court cases that had approved SEC disgorgement. Those cases, beginning with Texas Gulf Sulphur, did not look to statutory text. They certainly did not settle the meaning of text that did not even exist yet. Instead, we have here only congressional silence, and silence does not give an agency any authority to act, much less the authority to punish. Mr. Rapaul, you started out by saying Kokesh labeled this a penalty and equity doesn't enforce penalties, and that's it. But Kokesh was in a specific context. It said for statute of limitations purposes, it is a penalty. For a different purpose, it need not be characterized as a penalty for determining whether the fraudster can retain the profits of the fraud. That's something different. But the notion that because we categorize it in one context, disgorgement as a penalty does not necessarily carry over to another. There was a great legal scholar who has been often quoted by this Court, Walter Wheeler Cook, who said the tendency to assume that a word appearing in two or more legal contexts and so in connection with more than one purpose, one purpose is statute of limitations, another is depriving the fraudster of the profits of the fraud, to assume that characterization in one context carries over to another is a notion that has all the tenacity of original sin and must constantly be guarded against. So all Kokesh did was say for statute of limitations purposes, this is a penalty. It did not say, in fact, it was specific in footnoting that it was not saying that in every context it is a penalty. Justice Ginsburg, I certainly agree that this Court reserved this question in Kokesh in footnote 3. And my argument is not that the holding of that case resolves this case, but the reasoning of that case can't effectively be distinguished from this case. And my reasons for saying that are the issues to which this Court looked in Kokesh in determining whether SEC disgorgement is a penalty track the reason or the justifications or the cases in which equity said it would not enforce penalties. The most important of those is Kokesh's second reason, which is that it found that SEC disgorgement has primarily a punitive purpose. And that goes directly to the core of the equity distinction. Why is that so? Is it not an equitable principle that no one should be allowed to profit from his own wrong? That's not an equitable principle. That is certainly an equitable principle, Your Honor. However, it is also an equitable principle that a court of equity will not inflict a penalty. It will make the person no worse off than they were had they not committed the wrong. And SEC disgorgement is a penalty within the meaning of that rule because, as the Court stated in Kokesh, it does, in fact, frequently does, did in this case, leave the wrongdoer worse off than if the wrong had never been committed. But is your argument that disgorgement is never possible or that disgorgement has been interpreted too broadly by the courts? Suppose it were limited to net profits, and suppose every effort was made to return money to the victims of the fraud. Would that not fall within a traditional form of equitable relief? I think it still would not, Your Honor. And the reason is that the traditional form of equitable relief to which the government has drawn an analogy is the accounting. And an accounting did have those characteristics that Your Honor has stated, but it also had the characteristic that it was typically available only in cases involving a breach of fiduciary duty. Now, there are instances in which it was applied outside breaches of fiduciary duty, but I believe that in those cases it would be properly characterized as part of the equity court's ancillary jurisdiction. And a remedy that was only within the ancillary jurisdiction of a court of equity would not be a remedy that was typically available in equity, as this Court has interpreted that phrase. What do you mean by ancillary? Ancillary jurisdiction meaning that once a court had some other independent ground of equitable jurisdiction over the case, and this is true of the old patent and copyright cases, it might then go on to award an accounting in order to afford complete relief. How about the fraud cases in which it was granted? So I believe that the fraud cases, and we do address this in our reply, Your Honor. I believe the fraud cases all that the professors – I assume you're referring to the fraud cases cited in Professor Laycock's brief. And I think those all involve fiduciary relationships. Let me go back to that answer you gave. There is a statute here that entitles the court to give equitable relief that may be appropriate or necessary for the benefit of investors. I'm not sure why this doesn't provide ancillary jurisdiction in the manner that you've spoken about, assuming, as Justice Alito has just stated, that the accounting is only for net profits that are given to the actual people injured. We have other – I recognize the multitude of questions, joint and several liability, recovery for net profits of people to fees and things like that. Putting all of that aside, just a simple, straightforward case of net profits from investors who are actually injured. So I have two answers to that, Justice Sotomayor, if I may. And the first answer is that precisely because of the complexities that your question recognizes, the better course would be to say this remedy that the SEC has sought here, SEC disgorgement, which does not have a historical parallel, does not exist. Sotomayor. So why is it okay in the administrative process and in all the other laws where you say disgorgement is referenced, you're making an argument that there should never, ever be disgorgement? Not at all, Your Honor. In any statute? Because it's undefined in some way outside the common law? Not at all, Your Honor. I'm saying that in those – when Congress says disgorgement, then it is the court's task to figure out what does disgorgement mean. And perhaps in doing so, look at that history and say, well, it would, you know, the money has to go back to the individuals and it can be no more than the amount of the gains and so forth. But in a case where Congress has not said disgorgement and they did not say so here, I think the court should hesitate to read it into a general provision for equitable relief. If we keep going. And my second point in connection with that is that the reason not to read equitable relief to encompass ancillary jurisdiction is the same one this Court gave in Great West. And that is that if you – because an equity court having jurisdiction of the case could award any kind of relief using its ancillary jurisdiction, including even compensatory or punitive damages, if you were to read the term that broadly, it would be no limitation at all. If we were not to agree with you on this last point, what do you then say to Justice Alito that net profits return to victims? If you were not to agree with me on that point, then those are the primary inconsistencies that we've identified, we've established with regard to historical remedy. I do think that the remedy that was applied here, that the SEC sought here, was clearly a penalty and clearly inconsistent with COCESH. And that the – there is an important background principle that can – And that's because it was not limited to net profits and was not returned to the victims, at least not necessarily. Yes. And I would also say because it doesn't have the historical parallel because there was no fiduciary duty pleaded or proved, but Your Honor has questioned that point. And – You may be right or wrong on that point. I just wanted to isolate your answer. Okay. So – Just to be clear. Analytically, Your Honor, the point is separate. I do think that there are substantive reasons for limiting the remedy to the fiduciary duty as well. And that goes – and this is discussed in the amicus brief by Professors Bray and Smith that talk about the origins of the fiduciary or rather the accounting remedy and explain that it is in some respect equity forcing the fiduciary to do what the fiduciary should have been doing in the first place, which is to keep track of the to make no profits on it and to remit to that person any profits they had gained. Those are substantive duties that do not apply to everyone who is subject to the securities laws. How realistic do you think it is to assume that when Congress used this term equitable relief, Congress meant to incorporate every curly cue of old equity jurisprudence? My best answer to that, Your Honor, is that this Court had given the phrase equitable relief in ERISA, that meaning 6 months before Congress passed this statute. So if Congress had wanted to know exactly what equitable relief meant in the most recent precedent of this Court, in a statute that I think has some similar structural issues to this one, and I would like to get to those, they would have gone to Great West and they would have said, okay, they will look to history if we use these words. If we don't want them to look to history, we should use other words. We should use words, for example, such as they later used for the CFTC, where they said equitable remedies and disgorgement and restitution count as equitable remedies. They would have enlarged it if they wanted to go beyond historical remedies, given the interpretation that this Court had given those words so recently. But, Mr. Rapault, Congress acted against a backdrop in which the SEC was routinely  It did, Your Honor. However, I do not think that that supports the government's position here for two reasons. The first is that those cases, the cases that form that backdrop, were not interpreting the text, not interpreting any words, and so the prior construction canon by its terms does not apply. The second and perhaps more substantive reason is that the decisions in the circuit courts were not, although there was a consensus that the SEC could get something that counted as disgorgement. There was not a consensus as to what the — what that disgorgement was. And I would point to two specific examples. One is the Lipson case, which the government cites in its brief as one of its consensus cases. That's a Seventh Circuit decision by Judge Posner. It's earlier the same year that Sarbanes-Oxley was enacted. And that decision says that the relief in that case, the disgorgement in that case, counted as equitable relief under Section 21d only because it was relief against a fiduciary. So if you think that Congress meant to adopt the circuits, you would then have to decide, did it mean to adopt Judge Posner's view, in which case we would be correct that only fiduciaries are covered. The second example that I would give you is the Fifth Circuit's decision in SEC v. Blatt. And that was a decision in which it explicitly stated that the money was going back to the investors. And so to the extent that what the government has sought to assert here is the authority to send the money to the Treasury, well, would Congress have looked at the decision in Blatt and said, well, no, actually, the money looks like it would go back to the investors and not to the Treasury. Kagan. Well, that may raise the qualifications that Justice Alito was talking about on what the disgorgement remedy would entail, but the basic understanding that there was something that counted as that that was in line with equitable powers, isn't that a reasonable way to read the statute? I don't think it is, Your Honor, because I think it would leave too many – it would essentially leave this Court in the position of deciding how the traditional remedy, which would not by its terms apply here. The government agrees in its brief that SEC disgorgement is a substantial departure from historical norms. How do you craft that historical remedy in light of all the policies under the Securities Acts to make sense here and apply here? And I think that should be done by the legislature in the first instance. I'm sorry, but they don't do it when they gave the SEC administrative authority for disgorgement. And if we have an administrative order by the SEC, we have to do exactly what you're telling us not to do. We would have to define what they meant by that. And so what's the difference between doing it in that context where Congress has used the word disgorgement and this context where we can presume or would presume that there was something called disgorgement that could have been restitution or unjust enrichment or something else of that ilk? Well, Your Honor, with respect, I think in the administrative context, they did – they did not give the SEC regulatory rulemaking authority concerning its disgorgement proceedings. So that question is not going to go to the courts in the first instance. It's going to go to the agency in the first instance, and then the agency will balance all the policy considerations that I'm talking about. But at least Congress has clearly said your agency may do this, and your agency may do this even if it's a punishment, I would submit. And there are important background principles that this Court should not – and the Court should not say this person may be punished where Congress has not said so. And I would refer back in that context to this Court's decision in Wallace v. Cutton, one of the early administrative law decisions, the Court's opinion through Justice Brandeis, where the agency in that case had the authority to bar people from trading in grain futures. But the language of the statute permitted them to do it only for – in cases of ongoing violations, and they wanted to do it in cases of past violations effectively to serve as a punishment for those past violations. And the Court said we will not – Justice Brandeis, what the Court said, we will not enlarge the statute. We will not put something in that Congress has not put there to make punishable what the statute – what by the terms of the statute – I'm not quoting exactly now. I'm paraphrasing. What by the terms of the statute was only to be prevented. And I think that that is a principle that ought to have some weight here as the Court considers what to do. This authority is being used by the agency to punish. That their justification for it is punitive, the Court's decision in Kokest said that it is punitive. Ginsburg, you agreed with me that it's an equitable principle that no one should profit from his or her own wrong. And I already suggested to you that it can be punishment in one context and it can be an equitable remedy in another context. Yes, Justice Ginsburg. But I would say that in – that I would refer back to this Court's decision in Livingston, which talked specifically about what counts as punishment in terms of the equitable rule. And in that case, it's one of the older patent cases. The special master had imposed a remedy that effectively was what we probably would call a damages remedy now. He allowed the patent owner to recover from the infringer, not what the infringer actually did gain, but what the infringer might have gained. And he said the measure is going to be – because this person is a trespasser and a wrongdoer, the measure of recovery is going to be what the patent owner lost, not what the infringer gained. And this Court said, no, that is a penalty that goes beyond the practices of equity. We are aware of no rule that converts a court of equity into an instrument for the punishment of simple torts. And I think with all – with the greatest respect, when you take the principle that no one can punish by their own – no one can benefit from their own wrong, excuse me, and you decouple that from the historical context and the historical context in which the rules apply, and you turn it into something, as was done here, where it exceeds what the district court found to be the gross pecuniary gain and where it requires a payment to the Treasury, it has gone beyond the realm of what equity would have recognized. Ginsburg. I thought there were efforts to get the money to the investors. It doesn't require the money you paid into the Treasury. If the SEC can locate the investors and get the money back to them, the SEC says that's what it would do. They do that in some cases, Your Honor. They do not do it in all cases. It is difficult from the public materials to determine how often they do it and how Well, suppose we were to reject your broad argument and focus the question on this issue and also on the net profits issue. What constraints do you think the SEC is under? I'm sorry, Your Honor. Constraints? On the question of giving money back to the investors. I think Justice Ginsburg raised the issue about maybe you can't find them. They're not identifiable. There are too many of them. What do you think that if we said, you know, it's an equitable principle that the money should go back to the investors if possible, what does that mean exactly that the SEC has to do? I would say that if you were to take that position and disagree with my primary argument, then the rule should be if you're giving the money back to the investors, then you can take it and not otherwise. Because if you're not giving it back to the investors, then it's just a punishment. So not otherwise, even if, like, you try to find the investors and you can't? Well, I mean, I don't know that there's any way in which the court could workably police how hard they're trying, Your Honor. Well, you know, make good faith efforts. Make, you know, diligent efforts. Whatever words you want to use. I mean, Your Honor could certainly write that a decision. In a decision, I don't think it would be sufficient guidance or sufficient compulsion to the agency to ensure that this was used for compensatory purposes and not for punitory purposes. I'm sorry. How hard is that? Presumably the investors would want money, and I suppose these things could be done, you know, secretly, but if the SEC is engaged in a proceeding like this with respect to investments, I would assume the investors should be pretty easy to find if there's money available. I guess what I would say, Your Honor, is that in many cases that they currently use the power, they don't even believe that it's appropriate to return the money to investors, and I would point to the Foreign Corrupt Practices Act cases as the biggest example of that. In theory, you know, could they find them? They apparently do find it difficult in many cases because in many cases the money goes to the Treasury. But there are many cases in which it is currently applied under which none of this that are basically just money taken from the investors and put to the Treasury because they wanted to use it as a deterrent. They wanted to use it as a deterrent and a punishment and to make an example out of the violators of the securities laws. Counsel, in equity, kind of paralleled in our class action practice today, we do police the efforts of the defendant to find and return money to the investors that he or she has defrauded. Now, sometimes there's some left over because people can't be found, and we've had cases about what to do with that money as well. But why doesn't that supply at least a ready guide and maybe make it impermissible for the government to not make any effort at all? But why can't we police it, assuming we reject your primary argument? I guess that would go — I would — I'm not saying you couldn't draw an analogy to the class action cases, Justice Gorgias. Clearly, you could. I think at that point— And they come from equity and traditional principles of equity, right? I mean, they're drawn from that. Under traditional principles of equity, they couldn't recover it because there's no fiduciary here, Your Honor. I understand the argument. But in the class action context, as a workable matter, you could, but I really think that it's getting to the point where the Court is creating a new regulatory scheme where one doesn't currently exist to save a remedy that was originally created on the basis of circuit court decisions that the government doesn't really defend anymore, and that the best course would be to say this remedy that the agency sought here does not exist, and if they think that they need this remedy, they should go to Congress for it. And may I ask you about your net profits rule? Similar kind of question. I mean, what does the SEC, in your view, have to deduct? So, at a minimum, they have to start from the right place, which is if they start from the gains to the individual defendant, rather than what they did in this case, which is starting from the losses to investors. And then I believe the standard that this Court — if you're going to go by the accounting standard that's applied in the old patent cases, you would say it's — you would say the manufacturer calculates the profits of his — of their own business. So it would be certainly legitimately expensive. Here we had lease payments that weren't disputed. There were actual lease payments. And equipment payments that wasn't disputed was actual equipment payment. And the district court said I'm not going to count any of that, essentially for punitive reasons. I think you're bad guys. You had fraudulent intent from the start. And so none of it counts. Breyer, if the leases in the machinery was just to print up only used for more fraudulent stuff, would you deduct it then? I mean, what they did is they had flyers going around saying invest in my fraudulent gold company, the equivalent thereof. And you deducted? Is that legitimate? I think there may be a certain point at which you could say — I mean, you could imagine the Ponzi scheme, Your Honor. And in the case of the Ponzi scheme, okay, it's all tainted. But I think that the decision below did not give the kind of consideration you would need to give before reaching that kind of conclusion about these defendants, where — You can finish that sentence. I'll put it right there, Your Honor. Okay. Thank you, counsel. Mr. Stewart. Thank you, Mr. Chief Justice, and may it please the Court. I'd like to begin by discussing the significance of Kokesh. And as some of the questions have illuminated, the Court in Kokesh said that disgorgement in SEC cases was a penalty for purposes of a statute of limitations provision. There's no reason to read the decision more broadly. And in particular, the three reasons that the Court gave for concluding that it was a penalty for these purposes don't — they can't map on to the criteria for determining whether something is equitable relief. The three characteristics that the Court identified were it's imposed as a consequence of violating a public law, it serves a deterrent purpose, and it's not compensatory. And I'd say first that all three of those characteristics were present in Kansas v. Nebraska, in which this Court, sitting as a court of original jurisdiction, ordered disgorgement in an interstate compact case. And in that case, the Court emphasized that when the interstate compact was ratified by Congress, it took on the character of a public law. And the Court said the equitable power of a court of equity is all the greater when the public interest is concerned. Second, the disgorgement remedy in that case was intended only to serve deterrent purposes. That was the whole justification for the remedy, because due to the fairly idiosyncratic  compensatory damages remedy would not be sufficient to deter future violations. And so compensatory damages were awarded, but the Court ordered partial disgorgement on top of that in order to ensure that there would be an adequate deterrent. And for the same reason, the third characteristic that the Court identified in Kokesh, namely that disgorgement in SEC cases is not compensatory, was true in Kansas v. Nebraska as well. The disgorgement remedy was ordered on top of the compensatory damages award that was deemed adequate to compensate Kansas for its losses. I'd like to turn next to the issue that was taking up the discussion towards the end of Mr. Rapoport's argument, which is the formula by which the SEC urges that disgorgement be calculated, and courts ordinarily calculate disgorgement in fraud cases. The Court in Kokesh cited the third restatement of restitution and unjust enrichment for the general rule that net profits are the measure of disgorgement and that the defendant is entitled to deduct its marginal costs. Now, the term general rule implies that there will be exceptions. And if you look at literally the next page of the restatement from the one that the Court cited, the restatement says, the defendant will not be allowed a deduction for the direct expenses of an attempt to defraud the claimant. And so, for example, if part of your expenditures are, as Justice Breyer was hypothesizing, if part of your expenditures are sending out fraudulent communications, false sales pitches that are intended to deceive consumers into buying securities, that would be the kind of expense that under traditional equitable expenses, under traditional equitable principles would not be allowed. A second example, in Foreign Corrupt Practices Act cases, the wrong is that the defendant company has obtained a contract by paying a bribe to the public official. And the SEC would say, in those cases, the proper measure of disgorgement is net profits earned on the contract. And so the defendant wouldn't be charged gross receipts. The defendant would be allowed to deduct its operating expenses. But we wouldn't allow the defendant to count the bribe itself as a cost of doing business, as a deductible expense. That, in our view, wouldn't be allowed in computing the amount of disgorgement that would be ordered. So the one thing that I would emphasize most strongly is we are not, as to measure of disgorgement, we are not asking for an SEC-specific rule. We believe that the arguments we've made in prior cases have been consistent with traditional equitable principles. Because even though the general rule is that you use net profits as the measure, that is subject to exceptions. And we rely on the exceptions in a variety of circumstances. The second point I would make is, if we're wrong, if in some instances or in some category of cases courts have been awarding disgorgement in an amount that exceeds what traditional equitable principles would produce, then the correct answer is not to give us everything, and it's not to give us nothing. It's that courts should continue to order disgorgement, but compute it in accordance with traditional general equitable rules, not in accordance with any SEC-specific  rule. Your position is, if I understand it correctly, follow whatever the common law rule was with respect to calculating net profits, return it to investors, but that you're also a victim, and so that you could take the money ahead of investors, that you can keep the leftover amounts. What is your position with respect to that broader question of who gets the money? Why is it the Treasury? It's not the SEC getting the money. And one could see potentially an argument that if the SEC got the money, it could then spend it on protecting investors. But if the Treasury is getting it, and I know you're going to say money is fungible, but if the Treasury is getting it, we don't really know if it's being used to help investors. Let me say three or four things in response to that. The first is that as an empirical matter, the SEC tries to return the money to investors when it can, and we're largely successful in doing that. Now, there is a category of cases like the FCPA cases, the Foreign Corrupt Practices Act cases, where sometimes we do get big judgments. They're not returned to investors because there really is no obvious universe of individual victims from an FCPA violation. But in cases where individual victims can be located and the money can be distributed, it's our general practice to do so. The second thing is – Before you leave that, I'm sorry to interrupt, but I thought last time around in Kokesh that the representation from the government was different on that score, and that sometimes you do and sometimes you don't. I mean, sometimes it is done and sometimes it is not done. Sometimes the reason that it is not done is, as I was saying with respect to the FCPA, there just is no obvious universe of investors. Sometimes it's not done because it's a fraud that involves bilking a very large number of investors out of a very small amount of money each, and it's deemed infeasible to go to the expense of locating the individuals given the small amount that each would receive. Is it sometimes not done just because it's not done? I can't rule out that possibility. I will say that this is at the discretion of the court. Now, the statute doesn't require that it be forwarded to investors in any particular category of cases, but this is at the court's discretion. Would the government have any difficulty with the rule that the money should be returned to investors where feasible? I would say if that is couched as a general equitable principle, that is, the court is sitting as a court of equity, and there would be nothing wrong with a district judge in an individual case saying, unless you can persuade me that it is infeasible to return this money to investors, I am going to order that that be done. I don't think that's typical practice. I'm sorry. I didn't mean to interrupt from Justice Sotomayor's question. I apologize. And so, yes, there is nothing in the statute that precludes in individual cases where it seems to be feasible. There's nothing that would preclude the district court from insisting on that. Now, as we pointed out in the brief, the Dodd-Frank Act does have these — I'm sorry. The Dodd-Frank Act has these provisions that identify permissible uses of money that is disgorged in a judicial or administrative action but is not ultimately forwarded to investors. It can be used, for instance, to pay whistleblowers. And so the statute specifically contemplates the possibility that disgorged funds sometimes will not be distributed for whatever reason, and it would really undermine the statutory scheme to say that distribution to investors is in all circumstances a prerequisite to disgorgement. Why? If the statute says that equitable relief that may be appropriate or necessary for the benefit of investors, do we have to say here, and should we say or not say here, that that means if it's not feasible to return it to investors, that it's for the benefit of investors to give it to the SEC? That statutory language, we think, and I want to explain why, refers to measures that will benefit the investor community generally, not necessarily the particular individual victims. And I give the following reasons. The first is that language applies to equitable relief generally under Section 21d5. And so if you imagine a court contemplating an injunction, it would obviously be a very constrained view of the court's injunctive authority in an SEC enforcement action to say that the court can only issue an injunction that will benefit the particular individuals who have been victimized. If we could get back to the money, which is where we're at, not conjunctive relief, I would like an answer to Justice Sotomayor's question, which is, if it's feasible, on what account should the government not be in the business of returning the money given the statement in the statute that we're supposed to be following equitable principles? I take that to be her point or her question to you, and I would appreciate an answer to that. I don't see a problem with saying it is appropriate or necessary only if it is forwarded to investors, if it is feasible to do that. The point I was making about the whistleblowers and such was Congress clearly didn't think that a disgorgement award could be appropriate or necessary only if it was forwarded to investors because it made specific provision for the circumstance in which disgorged funds were left over. The other point I'd like to address, and Mr. Can I make sure I'm clear on your answer to Justice Gorsuch and Justice Sotomayor? Because the first time you answered it, you said it would be appropriate for a district court to say that, and I think Justice Gorsuch then followed up, and Justice Sotomayor, would it be appropriate for this court to say that's the rule, namely that it has to be returned to investors where feasible? I wouldn't have a problem with that. I mean, I don't know that it is kind of in accordance with usual principles for the court to announce that sort of instruction, but it would be consistent with the SEC's practice. It would certainly be directing the district courts to do something that they could do already as an exercise of their equitable discretion. The only other thing I would say is it's common ground that the SEC is authorized to impose disgorgement administratively, and its decisions are reviewable, but they are reviewed under a more deferential standard. And so the court reviewing an SEC disgorgement order is not going to be asking was this the correct exercise of equitable discretion, just was it within the range of reasonableness. The other thing I wanted to say that I think is – I'm sorry, Justice Ginsburg. Ginsburg. You were talking about the administrative authority to order disgorgement, but you said that an ALJ can't do what a court could do, as it did in this case, order an asset freeze. But couldn't you take the administrative decision and ask a court to enforce that decision by freezing assets? I mean, we sometimes do, after issuing an administrative order, go to a court for enforcement if the defendant is not obeying. And I think one of the reasons that the SEC sometimes elects to proceed in court originally is if we have doubts about the defendant's compliance and we think we're going to be in court anyway, then we might want to save a step and go there first. I guess part of our response to the arguments about could we do this administratively are to the effect that it wouldn't be entirely unworkable. It would be better than no alternative at all. But there's no reason for the court to set up an incentive that creates an artificial – a system that creates an artificial incentive for us to proceed in that way, since the defendant will receive additional protections if the case is in court. The other thing I would say that I think is, at least in part, responsive to Justice Sotomayor's question and also responds to something that Mr. Rapowee said. He characterized the government as having conceded that our disgorgement is a substantial departure from historical norms. And that's not really what we said. In the last paragraph of our brief, the point we were trying to make was that you look back at the 19th century cases in which disgorgement was ordered, and they all involved awards to individual victims. That wasn't because there was a large body of law saying you couldn't award disgorgement to the government. It was simply because until the middle part of the 20th century, civil enforcement actions filed by Federal regulatory agencies were not a thing. And so the question didn't come up one way or the other. And when those types of actions started to become prevalent, courts had to grapple with questions about how do legal principles that were developed in the context of private suits map on to government enforcement actions. And in 1950, somebody could have argued very plausibly that it just doesn't make sense to order disgorgement to the government because the essence of disgorgement has always been payment to the wronged entity. You could also have made a strong argument on the other side that the core purposes of disgorgement are to prevent the wrongdoer from profiting from its own wrong and thereby to deter future violations. And disgorgement can serve those traditional purposes regardless of where the money ends up. And as of 1850, that was an open question. By the time that Congress enacted Section 21DE5 in 2002, that question had really been resolved because this Court in Porter and Mitchell had said the Federal Court's equitable powers are at their height when the public interest is involved. For 30 years, courts in SEC enforcement actions had been awarding disgorgement. Congress had passed statutory provisions that both presupposed the availability of disgorgement in SEC judicial proceedings and that authorized the SEC to impose disgorgement administratively. And so whatever else you – whatever other lessons you might derive from the decision to authorize this to be done in administrative proceedings, clearly Congress didn't think that there was anything incongruous about the idea of disgorgement going to the government, disgorgement going in an – in a government enforcement action. And so when Congress passed Section 21DE5 in 2002, if you were asking a kind of a conscientious, well-informed member of Congress what do you think you are authorizing when you authorize district courts to issue appropriate – equitable relief that may be appropriate or necessary, the first thing they would ask is what kind of equitable relief have courts been awarding up to this point. For instance, when you get statutes where – that authorize a court to issue an injunction in accordance with the principles of equity, how do you decide whether a particular injunction is in accordance with the principles of equity? You look at the way that equity courts have been doing it in the past. And the lesson the Court has drawn is you look to factors like adequacy of the remedy at law, irreparable injury, a grant of authority to proceed in accordance with the principles of equity is basically an admonition. Keep doing it the way that courts of equity have been doing it. And similarly, in 2002, a conscientious member of Congress would have thought at the very least I'm authorizing courts to continue to enter the equitable remedies that they have entered up to that point. And that was buttressed by the other provision of the Sarbanes-Oxley Act in 2002 that we've emphasized in our brief, which was the fair funds provision that establishes a mechanism to facilitate the distribution to investors of funds that are disgorged in a judicial or administrative proceeding. And it also authorizes civil penalties to be added to those funds. Breyer. What is your answer? What is your response to the argument, if I have it right, that in equity, the closest thing is restitution? And in Great West, the majority said, well, restitution was an equitable remedy when it was a case in equity, but it was a legal remedy when it was a case in law. Well, I think what Great West was dealing with specifically was a different thing. Let me say two things in response to that. The first, our Great West was dealing with a breach of contract action. And so the court in Great West said that in breach of contract suits, if the contract calls for party A to pay money to party B, a suit seeking to compel A to pay the money to B had historically been regarded as seeking legal relief, not equitable relief. And then, as Mr. Rapowi was saying, the court in Great West emphasized that, yes, there are some sorts of legal remedies. They're not considered inherently equitable, but courts of equity could sometimes award them as a matter of ancillary to their equitable jurisdiction. And the court said, at least under ERISA, that's not what equitable relief meant. I don't think disgorgement can really be portrayed in that way. I mean, obviously, in Kansas v. Nebraska, the court ordered disgorgement as, treated disgorgement as inherently equitable relief. And one sign that it regarded disgorgement as equitable rather than legal was it said it is an appropriate exercise of authority to enter partial disgorgement. Yes, we would have authority to require the defendant to hand over the full amount of its profits, but under the circumstances of the case, we think an adequate deterrent purpose would be served by requiring Nebraska to hand over a fraction of its profits, but far from the whole. That's the kind of equitable discretion that the — that's the kind of discretionary judgment that is inherent in equity. The other thing I would say about Mr. Rapowi's argument with respect to Livingston and the patent cases, I mean, the — before the court had specific statutory authority to do so, in cases like Livingston, the court held that a defendant's profits were the — were an appropriate element of relief in a patent infringement suit. And the defendant was not acting as a fiduciary or trustee. The defendant was simply committing a wrong using an invention in which the plaintiff had a property right, and that was found to be an appropriate element of relief. And the court in Livingston said it is not permissible for a court of equity to also award interest because that would be a penalty. Now, I think our legal system regards interest differently than it did back in the day, but I think the general principle from Livingston remains sound. That is, if a court were to compute disgorgement in accordance with traditional equitable principles, both the general rule that net profits are the measure and any established equitable exceptions to that rule, if the court computed a disgorgement award in that manner and then said I'm tacking on another 50 percent because your behavior was so egregious, we would agree that that would be a penalty. That would be something that would not be an appropriate exercise of equitable authority under Section 21d5. It could still be done in the SEC cases because the Congress has authorized civil penalties in addition to equitable relief, but it could not be justified as an exercise of equitable authority. But that's not what's being done in this case. Ginsburg. What do you do with the Ninth Circuit saying there were no legitimate expenses to deduct to arrive at net profit? Stewart. They allowed a very small deduction for the amount that remained in the corporate account and could be distributed to investors, and certainly that would always be an appropriate deduction, any benefit that the investors received at the end of the day. But there were basically two categories of expenses that the Ninth Circuit and the district court didn't allow. One was for the overseas marketing attempts, and I think that was simply the type of expense that Justice Breyer was talking about. This was money spent to perpetrate the fraud, money spent to try to induce other The other was, Mr. Rapowee is correct that some of the money was spent on things like equipment, facilities, things that in another context might have qualified as legitimate business expenses had there been a true intent to construct a cancer treatment facility and do what the marketer said they were going to do. What the district court said, and I believe this is on page 18A of the petition appendix, it characterized those expenses as a half-hearted attempt to convey the illusion of progress. And so the court's analysis on that point was not extensive, but we take the point to have been these were not legitimate business expenses because they didn't represent a true good-faith effort to construct the relevant facility. They simply represented an effort to fool investors into thinking that things were going along as planned. And those findings were certainly subject to being reviewed on appeal. We would agree that had the investors had it in their minds to construct the facility and it just didn't pan out at the end of the day, those would have been the sorts of things that could have been used as deductions. But given the conclusion of the lower courts that this was a pervasively fraudulent scheme in which essentially all of the expenses were made to perpetrate the fraud, then we think it's in accordance with traditional equitable principles to allow no deductions. But again, the point we had stressed most strongly is we think that Congress has authorized courts to award disgorgement as computed under traditional rules of equity. If in a particular case or even if in some larger category of cases the court believes that exorbitant disgorgement has been awarded, then the proper response is be more careful about to tell lower courts be more careful about the computation. It couldn't under any circumstances be a justification for holding that Congress has not authorized disgorgement at all. If there are no further questions, we would urge the Court to affirm. Roberts. Thank you, counsel. Four minutes.  Thank you, Your Honor. I will be brief. On the question of Kansas v. Nebraska, I believe that the Court was explicitly in that case exercising its authority in the singular sphere of interstate relations to craft a new remedy. It was not applying traditional equitable principles. There was a dispute between the majority and the dissent about whether it was appropriate to adopt Section 39 of the Third Restatement. But either way, that was a case of the Court making a new remedy that did not previously historically exist, and that would not be appropriate to do here where you were interpreting a statute in which Congress has already set forth a detailed remedial scheme. On the question of the calculation of the individuals of the amounts of disgorgement, there are explicit findings in this record as to the gross pecuniary gain to each individual. It's 6.7 for Mr. Liu, and it is 1.5 million for Ms. Wang. And if you are applying the traditional historical approach, you would start at the gain to each defendant. You wouldn't start at the total losses to investors and take deductions from there. And I think that goes to show how far the – both what happened in this individual case and also how far the analysis that's going on here is from the historical approach. I think that the scope of disgorgement has grown over time in part because it is not grounded in statutory text and that counsels for returning it to Congress rather than crafting a new remedy as a sort of adapting equitable principles. I think its practical function has been to compel payments to the Treasury. There is no historical precedent for that. I would cite the court's Gabelli case in which the court found that there was no precedent for applying the equitable doctrine of the discovery rule to cases by the government. So, too, here there is no precedent for using an accounting to compel funds to be paid to the Treasury. Finally — What about the statutes that assume the availability of disgorgement? Those statutes would have no work to do if the court can't order disgorgement absent express statutory authority. We tried to show in our opening brief, Your Honor, that most of those statutes do have some work to do. There are one or two that don't. Even in those cases, I would say that those statutes at most reflect a presupposition or awareness by Congress that courts were doing this, not an authorization, and authorization is what's needed to authorize — to inflict a penalty. Finally, if the court does conclude that some remedy may survive in some case, I would urge it nevertheless to reverse and not to amend in this case. These individuals have already been ordered to pay their entire gross pecuniary gains, and anything above and beyond that would go beyond the equitable principle that no individual should be permitted to profit from his or her own wrong. And with that, Your Honor, I would respectfully request the court reverse. Thank you, counsel. The case is submitted.